**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CATHY RAYCROFT BRIGGS, | Case No. 17-11535 (LSS) |
| Debtor. | **Re: Docket Nos. 100, 101** |

**MEMORANDUM**

Before me are two letters ("Letters") received and docketed by the Clerk of the Court on December 14, 2021 (D.I. 100) and December 21, 2021 (D.I. 101). In the Letters, Debtor Cathy Raycroft Briggs ("Debtor" or "Ms. Briggs"), disavows a settlement with her ex-husband, Paul D. Briggs, which I approved approximately six months earlier. Debtor also asks, in so many words, that I either find that she effectively cancelled the settlement agreement between her and Mr. Briggs or that the Order approving the agreement be set aside for breach of the agreement. After an evidentiary hearing, I have concluded that Debtor has not proven that there is a basis to set aside the Order or that Mr. Briggs breached the agreement. Accordingly, I deny Ms. Briggs' request.

**Procedural Background**

The history of this case is extensive and has been set forth in detail in my Memorandum Order Denying Motion to Dismiss dated June 1, 2021[1] in which I denied creditor Elizabeth Myers' motion to dismiss the bankruptcy case. Because it is informative, I quote that history here, verbatim.

[1] Memorandum Order Denying (I) Amended Motion to Dismiss Bankruptcy Case Under Section 727(a)(4), and (II) Motion to Avoid Preference Action 1-4, D.I. 90.

The procedural background is a little muddled in this long pending bankruptcy case. Ms. Briggs filed her voluntary petition (through her ex-husband, Mr. Briggs, holding a power of attorney) on July 14, 2017 ("Petition Date"). A little over two weeks later, on July 31, 2017, Debtor filed a Motion to Avoid Lien[2] in which she sought to avoid the judicial lien held by creditor Elizabeth Myers on any real property Debtor owned, including her home, 147 Cornwall Road, Rehoboth Beach, Delaware 19711 (the "Property").

Ms. Myers took several actions in response to the Motion to Avoid Lien. Ms. Myers: (i) objected to the relief sought in the Motion to Avoid Lien,[3] (ii) objected to Mr. Briggs acting as Debtor's power of attorney and asked the court to reject Debtor's bankruptcy petition;[4] (iii) filed an adversary proceeding seeking to determine the dischargeability of Ms. Myers' underlying debt[5] and (iv) moved to dismiss the bankruptcy case.[6] Multiple status conferences were held and the parties discussed appropriate sequencing of the various matters. As for the motion to dismiss, it was opposed,[7] and according to the Minute Entry on the docket, on January 18, 2018, a hearing was held and the motion to dismiss was "continued to a date to be determined so that the parties may conduct discovery."[8]

In the meantime, George Miller was appointed the Chapter 7 trustee (the "Trustee"). He conducted a section 341 meeting of creditors and filed a Report of No Distribution.[9] The Trustee also filed a Notice of Abandonment of the Property establishing a deadline for any objections.[10] No objections were filed and, per the notice, the Property was "deemed abandoned." The Trustee has taken no further role in the bankruptcy case.

Also in the meantime, after reviewing documentary evidence and hearing argument, I denied the objection to the power of attorney.[11] I also ruled on the Motion to Avoid Lien.[12] Based on competing written appraisals submitted by Debtor and Ms. Myers, I determined the value of the Property as of the Petition Date to be $290,000. After performing the appropriate calculations, I determined that all but $1,002.37 of Ms. Myer's judicial lien could be avoided. I also denied Ms. Myers' request that Debtor's homestead exemption be reduced under § 552(o). Thereafter, Ms. Myers filed a Motion

[2] D.I. 13.
[3] D.I. 15.
[4] D.I. 19.
[5] D.I. 33, *Myers v. Briggs,* Adv. Pro. No. 15-51845.
[6] D.I. 34.
[7] D.I. 41.
[8] D.I. 42.
[9] D.I. 3, 38.
[10] D.I. 39.
[11] D.I. 28.
[12] D.I. 61.

to Reconsider my ruling on the Motion to Avoid Lien. She argued that based on the October 13, 2000 Separation and Property Settlement Agreement between Debtor and Mr. Briggs ("Separation Agreement"), Debtor had an equitable interest in 100% of the Property and therefore that I undervalued Debtor's interest in the Property such that $127,004.74 of Ms. Myers' lien should not be avoided. After reviewing the Separation Agreement, I ruled that any equitable interest that Debtor may have had in Mr. Briggs' 50% ownership interest of the Property had ceased prior to Ms. Myers obtaining her judgment in Superior Court. All of these rulings are final; no appeals were taken.

The motion to dismiss did not resurface until 2020. On February 27, 2020, Mr. Briggs filed a motion ("Stay Motion") seeking a ruling on whether the automatic stay applied to an action Mr. Briggs sought to bring in the Court of Chancery to pursue an equitable interest he asserted in the Property.[13] Thereafter, Debtor filed a Certification of Counsel seeking approval of a Settlement Agreement between Debtor and Mr. Briggs ("Settlement Agreement") in which: (i) Mr. Briggs will pay Debtor $130,600; (ii) certain personal property is allocated; (iii) Debtor will execute a quitclaim deed to the Property in favor of Mr. Briggs; and (iv) mutual releases will be granted. Mr. Briggs is also required to satisfy Ms. Myers' secured claim in the amount of $1,002.37 and the PHH Mortgage. At a hearing on the Settlement Agreement, Ms. Myer's counsel raised the motion to dismiss. I determined not to rule on the Settlement Agreement pending a hearing on the motion to dismiss. Thereafter the parties agreed to a Scheduling Order, which was entered, culminating with a trial set for September 1, 2020.

Prior to the scheduled trial, Ms. Myers filed the Amended Motion to Dismiss Bankruptcy Case Under Section 727(a)(4).[14] She also filed a Motion to Void Preference Action.[15] Objections to both motions were filed separately by Debtor[16] and Mr. Briggs.[17] Both matters proceeded to trial and I took the matters under advisement.

The Memorandum Order Denying Motion to Dismiss was thereafter issued on June 1, 2021.

[13] D.I. 65.
[14] D.I. 76.
[15] D.I. 77.
[16] D.I. 86, 87. Debtor has revoked her power of attorney and is now acting on her own behalf and through new counsel.
[17] D.I. 83, 85.

This chapter of the case starts with where the Memorandum Order Denying Motion to Dismiss left off. Having dispensed with Elizabeth Myers' claims,[18] I held a status conference on June 7, 2021. At the status conference I sought to confirm whether, given the passage of time, the parties still sought approval of the Settlement Agreement.

With an answer in the affirmative from both parties, I approved the Settlement Agreement from the bench, stating:

> I am prepared to issue an Order authorizing Ms. Briggs, the Debtor, to enter into the Stipulation and Settlement Agreement as well as to approve it to the extent necessary, and I'm not sure it is, but it also talks in terms of sale and 363 so I will approve it as meeting those standards as well. Given my rulings, I believe the Settlement Agreement that's been entered into, which encompasses the transfer of (or the buyout of) Ms. Briggs' exemption in her homestead, is appropriate. Mr. Briggs is paying full value for that homestead exemptions as well as some funds for some ancillary personal property, and so I believe that that is appropriate. Does the automatic stay apply? I guess I'm not ruling on that necessarily, but what this agreement does settle is Mr. Briggs' assertion that he has an equitable interest in Ms. Briggs' portion of the home. That is still a contested matter, a contested assertion in any event, and how that would interplay with the homestead exemption, I don't really know, but I believe it's an appropriate settlement of all the issues between Mr. Briggs and Ms. Briggs in this case. I looked at the form of order and I'm not going to incorporate the Stipulation into the Order, but I will approve and authorize Ms. Briggs to enter into the Settlement Agreement and execute the ancillary documents that go along with that. And, as I said, I think it clearly meets the *Martin* standards for approval of a settlement and it also meets, to the extent necessary, the 363 standards.[19]

The Order approving the Settlement Agreement ("Settlement Order") was entered that day.[20] The bankruptcy case should have been closed at that time. It was not. The Letters followed.

---

[18] At the January 5, 2022 status conference, Ms. Myers' counsel confirmed that she was not pursuing her non-dischargeability claim and *Myers v. Briggs*, Adv. Pro. No. 17-51845 was dismissed.
[19] Recording of June 7, 2021 hearing reviewed on the Court's FTR system and cleaned up.
[20] Paul Briggs Exh. 2 (Order Approving Stipulation and Settlement Agreement), D.I. 94.

I held yet another status conference on January 5, 2022 to determine how to proceed on the Letters. At that time, Debtor stated that Mr. Briggs broke the Settlement Agreement by not returning her jewelry. She stated that while Mr. Briggs did return her jewelry boxes, she did not open them until Thanksgiving Day and at that time she found the boxes were empty. She also stated that the jewelry was not returned within 14 days of the signing of the Settlement Agreement (as required therein). Because of this, Ms. Briggs no longer wanted to honor the Settlement Agreement. Debtor also confirmed that she had terminated Beskrone's representation in December 2021.

In response to my inquiry, both Olga Beskrone (Debtor's former counsel) and Adam Hiller (Mr. Briggs' counsel) stated that a quit claim deed to the Property had already been transferred to Mr. Briggs, recorded with the Recorder of Deeds and that a check for $130,600 had been issued by the real estate attorney payable to a Delaware Care Plan for Cathy Briggs. Hiller represented that Mr. Briggs complied with all of his obligations under the Settlement Agreement and there is no basis to revoke or otherwise rescind the Settlement Agreement.

Having heard these statements, I concluded an evidentiary hearing was necessary to determine the state of affairs, particularly what had transpired since the entry of the Order approving the Settlement Agreement. I specifically wanted to understand the circumstances regarding the jewelry boxes and the whereabouts of any remaining personal effects.

**Factual Findings**

The evidentiary hearing was held on February 3, 2022. Three witnesses testified: Ms. Briggs, Mr. Briggs and Olga Beskrone.[21] Thirteen exhibits were admitted—twelve by Mr. Briggs and one by Debtor.

**A. The Settlement Agreement**

Debtor executed the Settlement Agreement on May 20, 2020. Mr. Briggs executed it on June 1, 2020. The Settlement Agreement was filed with the Clerk of the Court by Debtor under a "Certification of Counsel Regarding Paul D. Briggs' Motion to Determine that the Automatic Stay does not Apply or, in the Alternative for Relief from the Automatic Stay and Request for Approval form the Court of a Settlement Agreement Between Paul Briggs and Debtor."[22]

The Settlement Agreement contemplates a resolution of matters between Debtor and Mr. Briggs related to the Property and assertions that Mr. Briggs held an equitable interest in Debtor's interest in the Property. To resolve matters, Mr. Briggs is to buy-out Debtor's interest for $130,000. Mr. Briggs paid Debtor another $600 on account of a diamond ring (see below).

When Debtor signed the Settlement Agreement, she also signed a quit claim deed ("Quit Claim Deed")[23] conveying all of her right, title and interest in and to the Property to Mr. Briggs. Per the Settlement Agreement, the Quit Claim Deed was held in trust by

[21] Beskrone was called as a witness for Mr. Briggs. Beskrone was careful to assert attorney-client privilege when asked about her communications with her former client. However, on cross-examination, Debtor questioned Beskrone about certain communications between them, in particular, a July 6, 2021 letter from Beskrone to Debtor. Debtor had previously asked Beskrone to forward that letter to chambers to be used at the hearing, which Beskrone accommodated. The July 6, 2021 letter was admitted into evidence at Debtor's request.
[22] D.I. 73.
[23] Paul Briggs Exh. 8 (Quit Claim Deed).

Beskrone pending settlement. Within fourteen days of delivery of the Quit Claim Deed to Beskrone, Mr. Briggs was required to submit at least one application for financing to obtain the funds necessary to make the $130,600 payment ("Payment"). A closing on the Property was supposed to occur within 74 days after both parties signed the Settlement Agreement.

The Settlement Agreement also provides for the return of Debtor's personal effects.[24] With respect to Ms. Briggs' jewelry, a certain "diamond ring" was to "become or remain" the property of the Briggs' daughter, Ashley. As for the remainder of Ms. Briggs' jewelry:

> within 14 days after both parties have signed this Agreement, Mr. Briggs will bring the jewelry boxes and their contents (as-is/what-is) and the gold bracelet to Ms. Briggs' nursing home and drop them at the front desk for Ms. Briggs. If Ms. Briggs' nursing home will not accept this due to quarantine, the Parties will make good-faith efforts for the turnover of these assets.[25]

Other personal effects are divided into two categories. "Stored Property" is defined as certain valuables Mr. Briggs removed from the Property and stored at his house for safekeeping. These items, which include furnishings of value, are being stored on the second floor of a barn located on Mr. Briggs' property. "Ms. Briggs will communicate to Mr. Briggs which of the Stored Property she wants once she has secured new housing, and the parties shall work out in good faith how these items will be retuned to her (on an as-is/what-is basis)." As for items at the Property, "if Ms. Briggs relocates from her present residence, then at a mutually convenient date/time with reasonable notice to Mr. Briggs and Ashley Briggs, she may send movers to the Property to pick up the specific assets that she

---

[24] To be clear, Mr. Briggs never asserted an interest in any of Mrs. Briggs' personal property.

[25] Settlement Agreement ¶ 3d.

will need for her new residence. Anything she does not take on that date (or dates, if the packing and moving of her possessions spans multiple days) will be deemed abandoned."[26]

The Settlement Agreement also provides for mutual releases. Debtor releases Mr. Briggs, Ashley and Timothy Riddle (Ashley's boyfriend) from all claims and causes of action, known or unknown from the beginning of time except for obligations under the Settlement Agreement. But,

> [n]otwithstanding the foregoing releases, Ms. Briggs explicitly retains any claims or causes of actions she may have against Mr. Briggs, Ashley Briggs, or Timothy Riddle arising from her placement and continued stay at Cadia or any other hospital, mental health facility, or long term care or nursing facility, any claims or causes of actions she may have against Mr. Briggs, Ashley Briggs, or Timothy Riddle arising from missing or damaged property other than the jewelry specifically addressed elsewhere in this agreement and any claims or causes of actions of a tortious nature.[27]

**B. The Closing**

Because I decided to hear Ms. Myers' Motion to Dismiss before ruling on the Settlement Agreement, the deadlines in the Settlement Agreement could not hold. By an exchange of emails dated July 1, 2021 between Beskrone and Hiller, the deadline for the closing on the Property was extended to September 17, 2021. It was also agreed that "Mr. Briggs will continue to hold any personal property (jewelry boxes, etc.) required under the agreement until a reasonable time after Ms. Briggs' written request (preferably by email between us)."[28]

---

[26] Settlement Agreement ¶ 3. Tragically, Ashley died on Easter day, 2021.
[27] Settlement Agreement ¶ 5a.
[28] Paul Briggs Exh. 3 (July 1, 2021 emails between Hiller and Beskrone); *See also* Paul Briggs Exh. 9 (June 9, 2021 email from Beskrone to Hiller) ("I have spoken with Cathy Briggs and she recognizes that having her jewelry boxes with her in the nursing home will be risky – that there is a good chance that her jewelry will be stolen. Ms. Briggs has asked that Mr. Briggs hold onto the jewelry boxes until she has moved into her own home or until she asks him to deliver the boxes to her.").

On August 5, 2021, Ms. Briggs sent a handwritten Notice (the "August 5 Notice") to Mr. Briggs informing him she was cancelling the Settlement Agreement, as follows:

> I am cancelling the settlement agreement between us due to your failure to return my jewelry 14 days after signing document. I signed May 20, 2020, you signed June 1, 2020. Page 7 of 10 (bii) covers this. I have asked for the jewelry many times.[29]

Because of the Notice, Beskrone indicated to Heller that she would not release the Quit Claim Deed from escrow without authorization from Ms. Briggs.

In response, on August 19, 2021, Mr. Briggs filed a motion to enforce the Settlement Agreement.[30] The express purpose of filing the Motion to Enforce was to compel Ms. Briggs to authorize Beskrone to deliver the Quit Claim Deed from escrow. As put by Mr. Briggs, by the Motion to Enforce he sought specific performance of the Settlement Agreement. Mr. Briggs represented that he was "ready, willing and able" to close on the Settlement Agreement by the extended deadline of September 17, 2021. He also represented that he had delivered the jewelry boxes as requested by Ms. Briggs. The proposed form of Order included a finding that Mr. Briggs had not breached the Settlement Agreement, an instruction by the Court to Beskrone to release the Quit Claim Deed from escrow upon tender of the Payment and a ruling that the Payment could be reduced by $1,000 per day as liquidated damages permitted in the Settlement Agreement for each day after August 11, 2021 until the Quit Claim Deed was recorded. The Motion to Enforce was scheduled for a hearing on September 9, 2021 with objections due on September 2, 2021.

---

[29] Paul Briggs Exh. 4 (August 5, 2021 Notice from Cathy Briggs to Paul Briggs).

[30] Paul Briggs Exh. 5 (Paul D. Briggs Motion to Enforce Settlement Agreement), D.I. 96 ("Motion to Enforce").

The day after the Motion to Enforce was filed, Beskrone emailed Hiller and stated that she had spoken with Ms. Briggs who would now allow the release of the Quit Claim Deed.[31] Beskrone also states that she will reach out to Debtor once Mr. Briggs is prepared to close and confirm, again, that she may release the Quit Claim Deed prior to doing so.[32] Mr. Briggs did not immediately withdraw the Motion to Enforce because he was concerned that Debtor would change her mind.

Mr. Briggs engaged Christina Pappoulis, Esquire as the settlement attorney to handle the closing on the transfer of the Quit Claim Deed. On September 1, 2021, Pappoulis drew a check on her Attorney Trust Account for $130,600 in favor of Delaware Care Plan /Cathy Briggs and delivered it to Beskrone. Beskrone delivered the Quit Claim Deed to Pappoulis.[33] The Quit Claim Deed was recorded with the Recorder of Deeds of Sussex County on September 20, 2021.[34] Mr. Briggs paid Ms. Myers $1,002.37 in satisfaction of her lien against the Property and took the Property subject to the PHH mortgage, which he has been paying.

On September 17, 2021 (about two weeks after the closing on the Property), the Motion to Enforce was withdrawn.[35]

Mr. Briggs first tried to finance the Payment by a loan on the Property. When that was unsuccessful, he took out an equity loan on his own house. He has been paying interest on the equity loan since July, 2021. The Property is currently under contract. It was originally scheduled to close in January, 2022. Mr. Briggs was able to extend closing until

---

[31] Paul Briggs Exh. 6 (Aug. 20, 2021 email from Beskrone to Hiller).
[32] *Id.*
[33] *See e.g.* Paul Briggs Exh. 7 (Check number 7296 drawn on Attorney Trust Account, Christina Pappoulis, Esq.)
[34] Paul Briggs Exh. 8 (Recorded Quit Claim Deed).
[35] D.I. 98.

the end of February because of this hearing. The purchaser is an unrelated party and Mr. Briggs does not know if the closing can be further extended.

**C. The Jewelry**

Debtor owns jewelry that she collected over the years. She describes it as many jewels as well as gold chains. At some point the jewelry was insured for $20,000. Debtor owns two jewelry boxes, a large 12x15 cherry or mahogany wooden box with brass trim and a small plated glass box. Sometime after Debtor went to the hospital, Mr. Briggs removed the jewelry boxes from the Property for safe keeping and informed Debtor. He put all the valuable jewelry in the smaller plated glass box. Mr. Briggs testified that he did not take anything from the jewelry boxes and never saw anyone take anything from the jewelry boxes. Testimony from both Debtor and Mr. Briggs suggested that Ashley or her boyfriend, who both had access to the Property and Mr. Briggs' house, may have stolen the jewelry to support their drug habits.

On June 7, 2021 (well after the initial deadline for delivery of the jewelry boxes), Debtor informed Beskrone that she did not want the jewelry boxes delivered to her while she was in Cadia because of the risk of theft and asked if Mr. Briggs could hold on to them until Debtor moved from the nursing home.[36] Beskrone put this request to Hiller on June 9, 2021.

Shortly thereafter, on July 3, 2021, Beskrone, at Debtor's request, asked that Debtor's jewelry boxes be brought to the nursing home by July 9, 2021.[37] Mr. Briggs left the jewelry boxes at the front desk of the nursing home on July 8, 2021.[38] Debtor opened the

---

[36] Paul Briggs Exh. 9 (June 9, 2021 email from Beskrone to Hiller); Debtor Exh. 1 (July 6, 2021 letter from Beskrone to Debtor) 2.
[37] *See e.g.* Debtor Exh. 1.
[38] *See e.g.* Paul Briggs Exh. 10 (July 14, 2021 email from Mr. Hiller to Ms. Beskrone).

jewelry boxes no later than September 15, 2021.[39] At that time, the only thing she reported missing was an antique garnet ring.[40]

**Discussion**

By the Letters, Debtor seeks some kind of cancellation of the Settlement Agreement or a declaration that the Settlement Agreement was already cancelled per the August 5 Notice. Debtor's theory is that Mr. Briggs breached the Settlement Agreement by not returning Debtor's jewelry boxes within 14 days of the fully executed Settlement Agreement. She also seeks this relief because once returned, the jewelry boxes did not contain all of her jewelry.

Debtor has not met her burden to show that Mr. Briggs breached the Settlement Agreement with respect to the return of Debtor's jewelry. As for the stated deadline in the Settlement Agreement, an extension of this deadline was necessitated by the delay between the presentation of the Settlement Agreement (June 11, 2020) and its approval (June 7, 2021). Had no extension been given, Mr. Briggs would have been in default the moment the Settlement Agreement was approved. The evidence shows the realization of the need for an extension of that date and reflects an extension. The parties subsequently agreed that Mr. Briggs would hold the jewelry boxes "until a reasonable time" after Debtor's request. On July 3, 2021, Debtor requested that her jewelry be returned to her by July 9, 2021 and it was returned prior to that date. Accordingly, the jewelry was timely delivered under the Settlement Agreement.

---

[39] Paul Briggs Exh. 11 (Sept. 15, 2021 letter from Debtor to Mr. Briggs).
[40] *Id.*

Debtor has also not met her burden to show that Mr. Briggs is responsible for any missing jewelry. First, the Settlement Agreement provides that Mr. Briggs was to bring the jewelry boxes and their contents to the nursing home on a "as-is/what-is" basis. The inclusion of this term in the Settlement Agreement makes clear that Mr. Briggs was not guaranteeing the content of the boxes. Second, there is no evidence that Mr. Briggs is responsible for the loss of any jewelry. The evidence suggests any one of multiple causes for the loss, including the theft of the jewelry by Ashley or her boyfriend, who had access to both the Property and Mr. Briggs' home and/or the loss of jewelry once received at the nursing home. Third, on September 15, 2021, Debtor wrote a lengthy letter to Mr. Briggs and listed only one item of missing jewelry. While the loss of Debtor's jewelry is unfortunate, on the evidentiary record presented, that loss cannot be attributed to Mr. Briggs. For these reasons, I cannot find that Mr. Briggs is in breach of the Settlement Agreement.[41]

However, even if Mr. Briggs had breached the Settlement Agreement with respect to the return of Debtor's jewelry, I would not rescind or set aside the Settlement Agreement with respect to the Property. This portion of the Settlement Agreement has already been performed. The Quit Claim Deed has been recorded. Mr. Briggs made the Payment to the settlement attorney for the benefit of Debtor.[42] Mr. Briggs paid the amount owed to Ms. Myers and has taken on the remaining obligations under the PHH Mortgage. He also took out a loan in order to make the Payment.

---

[41] I make no findings or conclusions as to whether Mr. Briggs or Debtor has otherwise breached the Settlement Agreement. Any such disputes belong in a state court of competent jurisdiction or in arbitration, if requested by either party (Settlement Agreement ¶ 9e).

[42] The payment was the full amount of Debtor's claimed exemption in the Property.

Ms. Briggs relies section 9b.ii. of the Settlement Agreement which provides that if Mr. Briggs defaults on the Settlement Agreement, Debtor may terminate it "whereupon none of the provisions of this Agreement shall be binding upon the Parties." It is not clear how this provision can work with respect to completed performance under the Settlement Agreement as opposed to the forward-looking portions of the Settlement Agreement that have not yet been performed. To the extent that Ms. Briggs relies on this provision of the Settlement Agreement, I find it to be vague and therefore unenforceable as applied to the matter before me and would sever it from the contract—as it relates to the return of the jewelry only—as permitted by section 14 of the Settlement Agreement.

Finally, while not expressly stated in the Letters, I do not find cause to reconsider the Order approving the Settlement Agreement. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki Millington*, 779 F.2d 906, 909 (3d Cir. 1985). Such a motion should rely on one of three grounds: (i) an intervening change in the controlling law, (2) the availability of new evidence that was not available when the court granted the motion, or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Wiest v. Lynch*, 710 F.3d 121 (3d Cir. 2013). A motion for reconsideration "is not properly grounded on a request that a court rethink a decision already made." *Millington v. GEICO*, No. 14-929, 2015 WL 7194462 *1 (D. Del. Nov. 16, 2015) Stark, J. Here, there is no manifest error of law or fact, no new evidence and no manifest injustice. Prior to approving the Settlement Agreement, the parties confirmed their desire to go forward with the agreement. And, in the face of the Motion to Enforce (due to Beskrone's refusal to deliver the Quit Claim Deed because of Debtor's August 5 Notice), Debtor acquiesced. This permitted the Closing on the

Settlement Agreement resulting in the recording of the Quit Claim Deed, the payment of Ms. Myers, continued payment of the PHH Mortgage and expenditures of funds by Mr. Briggs in reliance on the Settlement Agreement. Another change of heart cannot justify reconsideration of the approval of the Settlement Agreement.[43]

**Conclusion**

For the foregoing reasons, I conclude that Debtor is not entitled to any relief from the Settlement Order or the closing on the Quit Claim Deed. In doing so, I do not mean to minimize the loss of Ms. Brigg's jewelry which is obviously invaluable to her, appears to have been acquired over a lifetime and no doubt conjures up precious memories. But, the relief Ms. Briggs seeks simply is not available or appropriate. A separate order will follow.

Dated: February 14, 2022

Laurie Selber Silverstein
United States Bankruptcy Judge

[43] Debtor testified that she was pressured into signing the Settlement Agreement or going forward with it by either Mr. Briggs and/or her attorneys. This is not supported by anything in the record. The July 6, 2021 letter put into evidence by Debtor shows that Debtor's attorneys were providing her with advice that they deemed appropriate under the circumstances. Debtor was free to terminate the engagement of her attorneys (as she subsequently did), if they were unwilling to take a course of conduct she insisted on.